United States Court of Appeals,

Fifth Circuit.

No. 92-1668.

Brenda CHILCUTT, et al., Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

Randell P. Means, in his individual capacity, Appellant.

Oct. 25, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before JOHNSON, JOLLY, and JONES, Circuit Judges.

JOHNSON, Circuit Judge:

When the defendant, United States of America, failed to properly respond to the plaintiffs' discovery requests in the case *sub judice,* the district court ordered the Government to produce previously requested documents and respond to unanswered interrogatories. The court also ordered the Assistant United States Attorney ("AUSA"), Mr. Randell Means, to personally reimburse the plaintiffs for attorney's fees which arose from the Government's discovery abuse. When the Government disobeyed the district court's order to fulfill its discovery obligations and attempted to deceive the court and the plaintiffs into believing that certain documents properly requested either did not exist or were not requested, the district court, exercising authority granted in Rule 37 of the Federal Rules of Civil Procedure, deemed that the liability facts of the plaintiffs' case were established for the purposes of the case. The Government and Mr. Means aver that the district court abused its discretion in sanctioning them. We disagree and therefore affirm.

I. Facts and Procedural History

On October 4, 1988, Brenda Chilcutt Wortham,[1] performing her duties as an employee of Chrysler First, Inc., visited the River Bend Post Office in Fort Worth, Texas, to pick up the

---

[1]The plaintiff married after the initiation of this action. The Court will therefore use her present name—Brenda Wortham—in this opinion.

company's mail. Soon after she entered the post office, she slipped and fell. The fall resulted in serious injuries which required Ms. Wortham to undergo several major surgeries and extensive medical care. Ms. Wortham's workers' compensation carrier, Home Indemnity Company ("HIC"), alleged that governmental negligence had caused Ms. Wortham's fall. HIC therefore filed an administrative claim with the United States Postal Service ("USPS") in August 1990, seeking reimbursement for monies paid Ms. Wortham for her work-related injury. Ms. Wortham filed a similar claim in October of the same year. The USPS denied both claims.

Ms. Wortham and HIC later commenced this action in the Northern District of Texas, suing under the Federal Torts Claims Act. In its initial scheduling order, filed on July 17, 1991, the district court stated that "[s]hould any party or counsel fail to cooperate in doing anything required by this order to be done, such party or counsel or both will be subject to sanctions, including dismissal or entry of default without further notice." R. at 26. In the court's memorandum attached to the scheduling order, entitled "Special Pretrial Instructions," the court informed the parties that it expected counsel for each party to cooperate fully in the discovery process. The court further warned that it would not tolerate discovery abuses, stating that "[u]nnecessary discovery or unreasonable delay may subject the infracting party to sanctions and the payment of costs." R. at 28. The court admonished the parties in the same manner in revised scheduling orders which were filed on February 27, 1992, and March 9, 1992.[2]

On March 24, 1992, Ms. Wortham served interrogatories and requests for production of documents and things on Randell Means, the AUSA in charge of the case.[3] In early April, she reiterated her request for many of the documents and things in subpoenas duces tecum. Although the Government produced some of the requested items for depositions, it did not answer or object to the requests for production or the interrogatories. Counsel for Ms. Wortham, Ms. Kelly Robbins, talked with Mr. Means several times by telephone and in person, both before and after the answers

---

[2]In the latter scheduling order, the court extended the discovery cut-off date to May 8, 1992, and scheduled the trial for the week of June 8, 1992.

[3]The Federal Rules of Civil Procedure required that the Government respond no later than April 23, 1992. FED.R.CIV.P. 33(a) and 34(b).

were due. She informed him that time was of the essence and reminded him that the discovery cut-off date was May 8. During each discussion, Mr. Means informed Ms. Robbins that he was preparing responses to the discovery requests and assured her that the answers were forthcoming. In reality, the answers were not forthcoming; Ms. Robbins' efforts to extract answers from Mr. Means were of no avail.

On May 19, 1992, twenty-six days after the Government's discovery answers were due, Ms. Robbins filed a motion to compel and a motion for sanctions. The district court scheduled a hearing on those motions for May 22. Mr. Means served Ms. Robbins with answers to some of the interrogatories and o bjected to others the morning of the hearing. However, at the hearing Ms. Robbins complained, not only about the tardiness of the recently-supplied answers and objections, but she also asserted that a number of the answers to the interrogatories were incomplete.[4] Further, although Mr. Means provided some important documents in response to the requests for production on the morning prior to the hearing,[5] he failed to produce other requested documents. In his answers to the production request s and again at the hearing, Mr. Means averred that at least half of the requested documents did not exist. One such document was an accident log which the plaintiffs claimed Mr. Svede, the Fort Worth USPS accident investigator and the Government's representative for this action, maintained.[6] Another was a standard accident report ("Form 1769").

The district court, reviewing these and other discovery infractions, refused to grant the

[4]The Government answered a number of the interrogatories by stating that it did not possess the information requested. For example, Mr. Means testified at the hearing that the janitorial contractor, Ms. Marilyn Chapman, knew the answers to four of the interrogatories. However, Mr. Means had never attempted to contact Ms. Chapman prior to the hearing to get the information. In fact, although Means possessed Ms. Chapman's address, he had never looked up her telephone number in the directory to call her. Further, although Ms. Chapman, who was not a hostile witness to the Government, worked at the post office each day, Mr. Means had never visited the post office during her work hours to question her.

[5]The documents showed that other people had fallen at other post office locations. Because the same contractor cleaned all of the post offices in the Fort Worth area and used the same type of wax on all of the floors, this information was quite beneficial to the plaintiffs, who claimed, among other things, that the post office floor was excessively slick.

[6]This log apparently contained information about remedial actions taken by the USPS in response to Ms. Wortham's accident, as well as information on other accidents which occurred at the River Bend location.

plaintiffs a default judgment. He determined that such a penalty was too harsh under the circumstances before him.[7] Nonetheless, finding that the Government's conduct was not substantially justified and that no circumstances existed which made sanctions inappropriate, the court concluded that a lesser sanction was, indeed, appropriate. The court first ordered the Government to deliver every document called for by the plaintiffs' requests for production to Ms. Robbins' office by May 27. The court directed Mr. Means to attach an affidavit to his responses to the discovery requests certifying that he, Mr. Means, had made inquiries which were calculated to disclose the existence of any document or tangible thing for which the production requests or subpoenas duces tecum called.[8] Additionally, the court ordered the Government to produce Ms. Chapman for a deposition on May 28 since the Government had failed to question her. Further, based upon the authority provided under Rule 37(d), the court ordered Mr. Means to pay for those deposition costs and all of the attorney's fees and other expenses the plaintiffs had incurred in preparing the motion to compel and the motion for sanctions. The court stated that these sanctions were against the attorney, not against

---

[7]However, he added that he would not rule "out the possibility of there being a default judgment on liability, and perhaps even on damages, if the government continue[d] the course of conduct" in which it had been engaging. Tr. Vol. 3 at 37.

[8]In his response to the requests for production, Mr. Means listed the name of each person he had contacted to assist in his search for pertinent documents. As required by the court, Mr. Means also attached an affidavit to the response, certifying the following:

> Every item responsive to plaintiff's discovery requests has been produced and is listed in this affidavit. I do further certify that I have made inquiries of such a nature as to be calculated to disclose the existence of any item of any kind or character called for by any of plaintiff's discovery requests. I do further certify that the person listed with each enumerated response after the title "*Contact:* " constitutes the persons contacted by me with regard to ascertaining the existence of and locating items responsive to plaintiffs' requests. I do further certify that the response there indicated represents the substance of the response of each such person to the inquiries made by me.

> I do hereby declare under penalty of perjury that the foregoing is true and correct.

R. at 181. As to the requests which called for Mr. Svede's accident log, Mr. Means stated in his response that Mr. Svede had been his contact person.

the United States, and forbade Mr. Means from seeking reimbursement from the Government.[9] The court also informed Ms. Robbins that after she reviewed the Government's recently provided responses to her discovery requests, she could file supplemental motions to compel and for sanctions if she so needed.

She did so. Among other things, she complained in her supplemental motions of the Government's failure to produce the Form 1769 and Mr. Svede's accident log. With respect to the latter, Ms. Robbins specifically pointed out that "Al Svede testified in his deposition (at page 114, line 16) that he keeps a log which, among other things, would contain information relating to types of claims and their disposition. Defendant has never produced this log." R. at 239.

Mr. Means responded to a large number, but not all, of Ms. Robbins' allegations.[10] Important for our purposes, Mr. Means stated that he had produced the only accident log that was responsive to the plaintiffs' production requests.[11] The hearing on this supplemental motion for sanctions occurred on Thursday, June 4, 1992, just four days—only one working day—prior to the scheduled trial. During that hearing, Mr. Means again claimed that although Mr. Svede possessed an accident log, it was not covered by the plaintiffs' requests for production.[12] Mr. Means again testified that no

---

[9]The Government filed an interlocutory appeal, asking this Court to review the district court's decision to sanction Mr. Means. However, because that court had not yet entered final judgment, we dismissed for lack of appellate jurisdiction.

[10]He stated that on May 29 he learned that he had previously provided incorrect information on the supplier of the floor wax. Mr. Means also asserted that he had "discovered" the existence of some documents which he had previously claimed were non-existent.

[11]More specifically, Mr. Means constated:

> *Plaintiff further complains that Al Svede has not produced his own log* relating to the same topic. *Defendant has certified, based upon the answer provided by Al Svede, that there is no record of any complaint of the type sought by Plaintiff's request.* There being no information of the type sought, as established by a *complete search* of the proper records of Defendant and the certified answer of Defendant, there is no violation of this Court's orders shown.

R. at 346. (Emphasis added).

[12]In their requests for production, the plaintiffs limited all inquiries to the River Bend Post Office location. At this June 4 hearing, Means stated that he had checked the log in question. He asserted, however, that the log contained no information on accidents which occurred at the River Bend location. The following transpired:

Form 1769 existed, claiming, "As I understand, the plaintiff says she filled that out and gave it to the witness on that date. Our position is that did not happen." Tr. Vol. 5 at 57.

Due to the numerous discrepancies between the plaintiffs' claims and the defendant's response, the court directed the Government to bring its witnesses, including Mr. Svede, to the court later on the same day. One of the first questions the court asked Mr. Svede concerned the existence of the

> THE COURT: Well, why haven't those accident logs been produced?
>
> MR. MEANS: Your Honor, as our motion sets out, the request related specifically to anything that dealt with these premises. A search has been conducted of those accident logs, as we have set out in our response to this supplemental motion, and there is no record in those logs relating to any accident or complaint on the premises of River Bend for the time—
>
> THE COURT: Well, that takes care of it. That's what she has asked for.
>
> And if you can at some point in time prove they misrepresented to you in saying that there is nothing, then they have got a different problem. But so far the representation is that there is nothing.
>
> MS. ROBBINS: Well, Your Honor, we do know of two accidents that occurred at that premises, and they would be listed in that log.
>
> THE COURT: Well, I have got to assume they don't do a very good job of keeping their records because *it's been represented that there is no record of those accidents. Is that what you are representing?*
>
> MR. MEANS: *That is correct, Your Honor.*
>
> THE COURT: Even though there are two other accidents on the premises, the post office department did not keep a record in any of its logs, accident logs or other books, of those accidents.
>
> MR. MEANS: There is one accident that was reported. That is the Chillcut (sic) accident this case is based on. And my representation is the same as what is reflected here. *Yes, Your Honor, there is no record of that in this log.* She refers to a second accident that occurred, and no further reporting was made. And the document that was filled out at the scene of the River Bend post office and has remained at that location has been produced, and *there is no other notation in the log of that transaction.*
>
> MR. MEANS: There is no record. As our response to this supplemental motion states, *I am stating under oath before the court as an officer of the court that my representations in that motion are correct, that a search of that log has been conducted, and no accident has been identified to the time periods in that log—and I believe it's 1987 through the present—for the premises, River Bend [post office], for both employee accidents or complaints or customer accidents.*

Tr. Vol. 5 at 48-50 (emphasis added).

Form 1769. Mr. Svede testified under oath that not only did the Form 1769 exist, *but that he possessed a copy of that form.*[13] If that were not bad enough for the Government, when Ms. Robbins asked Mr. Svede whether he had listed Ms. Wortham's accident in his accident log, he answered that he had done so. Mr. Svede presented the log to the court to review, and it did, indeed, list Ms. Wortham's accident, contrary to Mr. Means' earlier statement that it did not.[14]

The court disagreed, finding that several of the requests covered the accident log. The court further found that although the Government and the people working on the case knew that the log existed and that it was called for by the requests for production, the Government chose to withhold the documents in derogation of the discovery rules and the court's order compelling discovery. Finally, the court found that the Government had severely disadvantaged the plaintiffs by producing the documents on the eve of trial and by causing the plaintiffs' counsel to devote a great amount of time, not to preparing for trial, but to dealing with the Government's discovery abuses.

Exercising authority under Rules 37(b) and 37(d) of the Rules of Civil Procedure, the court determined that stiff sanctions were appropriate because of the Government's flagrant disregard of its discovery obligations and its flouting the court's order compelling discovery. Although the court believed that a default judgment as to liability or damages was justified, it decided instead merely to deem that the *prima facie* elements of the plaintiffs' liability claim were established for the purposes of the case. The court allowed the Government to present evidence of its affirmative defenses and required the plaintiffs to prove damages. After a bench trial on the Government's affirmative defenses and on damages, the court found for the plaintiffs and awarded them $892,567.00.

Not prone to overlook what appeared to be a "flagrant case of misrepresentation by Mr. Means, as well as a rather flagrant violation of the discovery obligations," the district court held a

---

[13]Mr. Means presented *no* explanation for his misrepresentation regarding Form 1769. In fact, even though Mr. Svede, *the Government's representative,* testified under oath that such a form existed and that he possessed a copy thereof, Mr. Means and the Government—similar to the argument that windmills are dragons—persist in their quixotic claim that the form does not exist. Tr. Vol. 5 at 142; Oral Argument Tape.

[14]*See infra* note 12. Mr. Svede provided no explanation as to the non-production of the log. Mr. Means merely asserted that he did not believe that the log was covered by the requests for production.

hearing to determine whether it should hold Mr. Means in criminal contempt of court and bar him from practicing before the Northern District of Texas. Tr. Vol. 3 at 4. During the hearing, the court ignored many of the discovery infractions and focussed solely on Mr. Svede's log. Despite the fact that he had previously referred to the accident log several times, both in his response to Ms. Wortham's supplemental motion for sanctions[15] and in a hearing before the court in which he had affirmed, as an officer of the court, that he had reviewed that particular log,[16] Mr. Means claimed at *this* hearing that he had never *seen* the log and had not known that it existed prior to the June 4 hearing.

The district court thought otherwise, concluding that he could find that the elements of criminal contempt were proved beyond a reasonable doubt. The court determined that Mr. Means had intentionally misrepresented to the court that Mr. Svede's log did not report Ms. Wortham's accident. However, giving Mr. Means the "benefit of the doubt," the court chose not to disbar him or hold him in criminal contempt. Instead, the court ordered Mr. Means to obtain fifteen hours of ethics or professional responsibility training by November 1, 1992. He also dictated that Means not be reimbursed for the training costs and ordered Mr. Means to reimburse Ms. Robbins for the time she had spent in the hearing. The Court again directed that Mr. Means not seek or obtain reimbursement for that sanction.

The Government and Mr. Means are not satisfied in the least bit with the outcome of this case, and they both appeal. The Government argues that the district court abused its discretion in deeming the liability elements of the case established. Mr. Means challenges the court's decision forbidding him from seeking reimbursement from the Government.

## II. Discussion

A. *Standard of Review*

Rule 37(b)(2) authorizes courts to appropriately respond to and deal with parties which have disobeyed discovery orders. District courts' discretion in fashioning appropriate sanctions for parties

---

[15]*See supra* note 11.

[16]*See supra* note 12; *see also supra* note 8.

who disobey their orders is quite broad, though not unlimited. *Marshall v. Segona,* 621 F.2d 763, 767 (5th Cir.1980); *Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379, 1381 (5th Cir.1976). Hence, the question we must decide in each of these issues is not whether this Court would have imposed the same sanctions as did the district court; the question is whether the district court abused its discretion in so doing. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 640, 96 S.Ct. 2778, 2778, 49 L.Ed.2d 747 (1976); *Shipes v. Trinity Indus.,* 987 F.2d 311, 323 (5th Cir.1993).

B. *Establishing Facts Against the Government*

### 1. Proper Standard

The Government, in its argument that the district court improperly sanctioned it, insists that the sanction in question was tantamount to a default judgment on both liability and damage claims. The Government therefore contends that Rule 37 dismissal and default judgment cases control the facts of this case. *See e.g. Batson v. Neal Spelce Associates, Inc.* 765 F.2d 511 (5th Cir.1985); *Marshall v. Segona,* 621 F.2d 763 (5th Cir.1980); *Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379 (5th Cir.1976). While it is true that a court's decision to deem certain facts established may equate to a default judgment in some circumstances, *see Marshall,* 621 F.2d at 766 n. 3, such is not the case here.[17]

The district court allowed the Government to present its case in chief on its affirmative defense issue. The Government did so: it called three witnesses to attempt to prove that Brenda Wortham's negligence, not that of the Government, had caused the accident. Because the court's ruling did not preclude the Government from presenting its case in chief, the sanction was a far cry from a default judgment.[18] Further, the Government's assertion that the court also granted a default

---

[17]We note that deeming the establishment of certain facts is one of the least harsh sanctions available to courts under Rule 37(b). Indeed, it is only more severe than the granting of expenses and attorneys' fees. *See* FED.R.CIV.P. 37(b)(2); *see also United States v. Sumitomo Marine and Fire Ins. Co.,* 617 F.2d 1365, 1369 (9th Cir.1980).

[18]Clearly, had the Government proved its case by a preponderance of the evidence, the fact that the liability elements had been deemed established would have been nugatory, and the Government would have been victorious in this litigation.

judgment on the damages issues is all but fanciful. Not only did the court require Ms. Wortham to prove damages, but on many of the damage elements, the court made conclusions which were very favorable to the Government.

Thus, we believe that the default-judgment/dismissal cases proffered by the Government impose too great a standard for the type of sanction involved here. Rather than look to those types of cases, we believe that the Supreme Court's decision in *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), governs this case.

There, the Compagnie Des Bauxites de Guinee ("CBG") filed suit in a Pennsylvania district court against its insurance companies. Several of the companies ("excess insurers"), including the Insurance Corporation of Ireland, filed motions for summary judgment based upon their contention that the Pennsylvania court lacked personal jurisdiction over them. CBG sought discovery on the personal jurisdiction issue; however, the excess insurers, though ordered and later threatened with sanctions, failed to make a conscientious effort to comply with the discovery orders. The district court therefore carried through on its threatened sanctions and determined that the excess insurers were subject to the in personam jurisdiction of the court for the purposes of the litigation. *Insurance Corp. of Ireland,* 456 U.S. at 697, 102 S.Ct. at 2101.

The Supreme Court, affirming the ruling of the district court, determined that decisions to impose sanctions under Rule 37(b) must be guided by two important considerations: The sanction must first of all be just, and it must "specifically relate[ ] to the particular "claim' which was at issue in the order to provide discovery." *Id.* at 707, 102 S.Ct. at 2107. The Court found several significant facts which contributed to its decision that the sanction was fair. First, the district court had warned the excess insurers on several occasions that continued delay and disregard of its orders would result in the imposition of sanctions. The Court also found that the excess insurers' repeated promises to comply with discovery orders was supportive of the district court's decision. Finally, the Court concluded that the allegation of personal jurisdiction was not frivolous and that CBG's attempt to use discovery to prove that personal jurisdiction existed was not a misuse of the judicial process. *Id.* at

707-708, 102 S.Ct. at 2106-2107.

Because the discovery in issue targeted personal-jurisdiction evidence, the Court had no problem in finding that the deemed finding—personal jurisdiction—was sufficiently related to the claim sought to be proved by discovery. *Id.* at 708-709, 102 S.Ct. at 2107. The Court therefore found that the district court did not abuse its discretion in sanctioning the excess insurers. *Id.*

We believe that the two standards presented in *Insurance Corp. of Ireland*—fairness and substantial relationship between the sanction and the claim—along with a third—that the sanction meet the Rule 37 goals of punishing the party which has obstructed discovery and deterring others who would otherwise be inclined to pursue similar behavior, *National Hockey League,* 427 U.S. at 643, 96 S.Ct. at 2781—should guide our review of the district court's decision in the case *sub judice.*

## 2. Just and Fair?

### a. Ample Warning

This case resembles *Insurance Corp. of Ireland* in several key respects. First, as occurred in that case, the district court here warned the parties many times that it would not tolerate discovery abuses. *See Bluitt v. ARCO Chemical Co.,* 777 F.2d 188, 191 (5th Cir.1985) (affirming the dismissal of a case where the district court found that the plaintiff's failure to obey discovery orders and heed warnings that dismissal would occur unless the plaintiff performed its discovery obligations showed that a sanction lesser than dismissal would have been of no avail).

In the instant case, the parties were warned in each of three scheduling orders, as well as in each of the memoranda which accompanied those orders, that discovery violations could result in dismissal or default judgment. Further, in the first hearing on Ms. Wortham's motion to compel, the district court, declining to grant a default judgment, specifically explicated that default judgment on liability and perhaps on damages might be justified if the Government continued in the type of conduct in which it was engaging.[19] Further, during the hearing on the second motion to compel, the district court warned that if the plaintiffs could prove that the Government had falsely stated that the log contained no information on accidents which occurred at the River Bend location, the

---

[19]*See supra* note 7.

Government would have a problem.[20]

Having been warned numerous times that discovery abuses in general and that the continuation of its conduct in particular might result in a default judgment, the Government should not have been surprised by the district court's decision to deem the liability facts established. In fact, based upon the Government's flagrant violations of its discovery obligations, its flouting the district court's discovery order, and its blatant misrepresentation to the court, the Government should have been relieved that the court did not order a much stiffer penalty.

### b. Empty Promises

This case is also similar to *Insurance Corp. of Ireland* in that the Government here, like the excess insurers there, repeatedly promised to comply with its discovery obligations. Ms. Robbins, the plaintiffs' counsel, testified that she communicated with Mr. Means numerous times, both face to face and by telephone, before and after the Government's answers were due, explaining to him that time was of the essence and reminding him of the discovery cut-off date. Even according to Mr. Means, each time he and Ms. Robbins talked, he promised that the answers would be forthcoming.

Without a doubt, those promises strung Ms. Robbins along, causing her to incorrectly believe that seeking an order compelling discovery or moving for Rule 37 sanctions was unnecessary. Ms. Robbins believed the Government's promises until it was nearly too late for her to adequately prepare her case. Had the Government simply refused to perform its discovery obligations without giving vain assurances of its alleged intent to comply, Ms. Robbins would almost certainly have sought an order to compel much earlier than she did. We view the Government's unfulfilled promises as the Supreme Court viewed the excess insurers' pledges to comply with CBG's discovery requests: They support the district court's decision to impose sanctions.

### c. Frivolity of the Claim

The Government has never contended that the plaintiffs' use of discovery was an abuse of judicial process. The plaintiffs had a colorable claim that the Government's negligence caused Ms. Wortham's accident. The Government conceded that only five of eight light fixtures were functioning

---

[20]*See supra* note 12.

on the day of the accident. More importantly, the concealed log proved that numerous other customers had likewise fallen at the River Bend Post Office.[21] The plaintiffs' claim of liability was far from frivolous.

### d. Other Considerations

### 1. Intentional Misconduct

The Government asserts that there is no evidence of willful or contumacious behavior in this case. It therefore claims that the district court's sanction was unjust.[22] We disagree. As discussed earlier, the sanction granted here was not tantamount to a default judgment, and this Court has never held that willful or contumacious conduct is a prerequisite to sanctions which are less harsh than a dismissal or default judgment.

Regardless of the proper *mens rea* standard however,[23] the credible evidence in the record of

---

[21]The district court stated that the only reason the Government would withhold Mr. Svede's accident log and then make misrepresentations as to the log's contents was to prevent the plaintiffs from learning that a number of other customers had also fallen at the River Bend location.

[22]This Court, and the Supreme Court, as well, have often forbidden the dismissal of a case if the conduct involved was not willful or contumacious. *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958); *Bluitt v. Arco Chemical Co.,* 777 F.2d at 190-91; *Batson,* 765 F.2d at 514.

[23]Because we conclude that the Government indeed flagrantly and willfully disregarded its discovery obligations and the district court's order, we need not determine what lesser standard of behavior would have justified the type of sanction ordered in this case.

> We note, however, that Rule 37(b) clearly indicates that district courts have authority to grant a broad spectrum of sanctions. Of course, the flagrancy of a party's behavior must be directly proportionate to the severity of the sanction imposed. Nonetheless, neither this Court nor the Supreme Court has ever determined that the lack of willful, contumacious, or prolonged misconduct prohibits all sanctions. On the contrary, we have held that dismissal or default judgment is *warranted* only when misconduct is quite serious.

> The Supreme Court made clear in *Rogers,* a case in which the petitioners were absolutely precluded by foreign law from turning over certain documents to the respondents, that though the petitioners were *unable* to comply with the discovery requests, the district court still had broad discretion to mete out a lesser sanction than dismissal. *Rogers,* 357 U.S. at 213, 78 S.Ct. at 1096 (stating that "[i]t may be that in the absence of complete disclosure by petitioner, the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events").

this case reveals quite readily that the Government not only intentionally withheld documents that it knew existed, but it also knowingly made blatant misrepresentations to the district court about the existence of those documents.[24] Such conduct, in our view is patently willful and contumacious. Indeed, the district court considered Mr. Means' behavior to be *so* willful and contumacious that it seriously considered disbarring Mr. Means and holding him in criminal contempt. The punishment meted out here clearly fit the conduct involved.

## 2. It's Not Our Fault

The Government further claims that it was an innocent client and that the district court unfairly punished it for the errors of its attorney, Mr. Means. This Court has often emphasized that an innocent party should not be severely penalized for the misconduct of its counsel. *Batson,* 765 F.2d at 514; *Marshall,* 621 F.2d at 768; *Factory Air Conditioning Corp. v. Westside Toyota, Inc.,* 579 F.2d 334, 337 (5th Cir.1978). However, the district court did not punish the Government for misconduct solely attributable to the Government's attorney. The court concluded that there was "no question but [t]hat [the accident log] was called for by the requests for production and was obviously known *to people that were working on the case on behalf of defendant.*" Tr. Vol. 5 at 148. The key people who worked on the case were Mr. Means, the Government's attorney, and Mr. Svede, the Government's representative.

There is ample evidence in the record to support the district court's conclusion that Mr. Svede also engaged in misconduct. During Mr. Svede's deposition, Ms. Robbins referred him to each request for production and asked him what documents were responsive thereto. Mr. Svede responded that he possessed an accident log which was called for by at least one of the requests. Mr.

Significantly, the Court explained that the type of conduct displayed by a party had no bearing on *whether* sanctions should be imposed, but only on the *type* of sanctions imposed. The Supreme Court explained, "[T]he willfulness or good faith of [a party], can hardly affect the fact of noncompliance and [is] relevant *only* to the path which the District Court might follow in dealing with [the party's] failure to comply." *Id.* at 208, 78 S.Ct. at 1094 (emphasis added). Hence, we simply note that willfulness is not required for deeming that certain facts are established for the purposes of a case unless that sanction is the equivalent of a dismissal or default judgment.

[24]This Court has noted, but chooses not to write on, numerous other discovery violations committed by the Government, as reflected in the record of this case.

Means testified that after the deposition, he went over the production requests with Mr. Svede numerous times to obtain his assistance in responding to the requests.[25] However, at the show-cause hearing, Mr. Svede claimed for the first time to have forgotten that the log, which was still in use, existed.

Mr. Svede's testimony, when considered alone, is incredible. Moreover, his testimony is contrary to Mr. Means' earlier testimony. As noted in section I of this opinion, Means stated as an officer of the court that he had reviewed Mr. Svede's log and had determined that it was not responsive to the plaintiffs' requests for production.[26] Despite these inconsistencies, however, the Government continues to ask this Court to believe that Mr. Svede, the Fort Worth USPS accident investigator, responsible for listing every accident in his own accident log which was kept in his own office, forgot that the log existed. It asks that we accept as true the "fact" that Mr. Svede could remember his log under the stressful conditions of a deposition, but could not remember that same log when he later reviewed the requests for production with Mr. Means.

We cannot accept the Government's ludicrous assertion that Mr. Svede was totally removed from the misconduct here. The district court's finding is amply supported by the evidence. We fail to see the injustice in sanctioning the Government for the misconduct of its representative in this case.[27]

### 3. Previous Sanctions

Highly supportive of the district court's decision to deem that the liability facts were established in this case is the fact that that court had previously sanctioned Mr. Means for discovery abuses. One would think that a $2500 sanction granted personally against the Government's attorney would have been warning enough that the district court would not tolerate any further discovery

---

[25]*See, e.g., supra* note 8.

[26]*See supra* note 12.

[27]We have previously held that the misconduct of an attorney who has been continuously employed by a party supports the imposition of a default judgment against that party. *United States v. Shipco General, Inc.,* 814 F.2d 1011, 1014 (5th Cir.1987). There is no question but that Mr. Means, a Department of Justice attorney, was continuously employed by defendant United States in this case.

abuses. Since such was not the case, the district court was well within its discretion to grant the harsher sanction.[28]

Nevertheless, the Government complains that the district court should not have jumped to the sanction it chose, but should have granted a less harsh sanction instead. In the Government's view, only after disobeying the order compelling discovery *after* the imposition of a *second,* less-harsh sanction should it have been punished as severely as it was punished. This argument is without merit.

Attorneys are professionals. They are, in every respect, officers of the court, and officers of the court must comply with each court order when it is issued—not after two or three warnings to do so and not after lesser sanctions are imposed. "It [should be] universally understood that a court's orders are not to be willfully ignored, and, certainly, attorneys are presumed to know that refusal to comply will subject them and their clients to sanctions." *Batson,* 765 F.2d at 515.

We conclude that the sanction granted against the Government was fair.

### 4. Related to the Claim Sought to be Proved by Discovery

The district court determined that the only reason the Government withheld the accident log was to prevent the plaintiffs from learning that a number of other customers had also fallen in the River Bend Post Office. Had the Government properly responded to the subpoenas duces tecum and requests for production, the plaintiffs would have been able to investigate those accidents and would likely have strengthened their liability allegations against the Government. Obviously, the Government's misconduct precluded that from happening.

When parties present no valid objections to discovery and intentionally withhold properly requested information, courts have the authority to presume that the party's refusal to produce the information is "an admission of the want of merit in the asserted defense."[29] *Hammond,* 212 U.S. at

---

[28]In *United States v. Shipco General, Inc.,* the district court initially sanctioned Shipco $500 for ignoring its discovery obligations and the court's order compelling discovery. Because that sanction failed to coerce compliance on the part of Shipco, the district court dismissed Shipco's claims against the United States. We affirmed. 814 F.2d 1011 (5th Cir.1987).

[29]The Supreme Court explicated:

> [B]eyond peradventure, the general course of legislation and judicial decision in the several states indicates that it has always been assumed that the power existed

351, 29 S.Ct. at 380;  *see also Insurance Corp. of Ireland,* 456 U.S. at 709, 102 S.Ct. at 2107. Based upon the facts of this case, we believe that the district court was well within its discretion to presume, for the purposes of this case, that the plaintiffs' liability claims were established.

### 5. Punishment and Deterrence

The Government argues that for such a relatively minor infraction, the district court should have granted a continuance rather than imposing the type of sanctions at issue in this case.[30]  First, it must be clear that unless compelling reasons exist, this Court will not require a district court to inconvenience itself by rearranging its calendar to accommodate a malefactor who has violated its discovery obligations.  *See Geiserman v. MacDonald,* 893 F.2d 787, 791-92 (5th Cir.1990).

Second, the Government's argument that its conduct was relatively minor and due solely to miscommunication and confusion makes it patent that the Government has yet to recognize that its conduct constituted serious infractions against the rules of discovery as well as against the district court, itself.  Far from being relatively minor infractions, the Government's conduct, as discussed above, was willful, contumacious, and flagrant.  Unfortunately, the sting of the punishment imposed here failed to bring home to the Government that its actions in this case fell far below that which is acceptable.  The Government's lack of concern about the behavior of its counsel and representative clearly demonstrates that it deserved the type of sanctions meted out here.  However, even if the Government were to become penitent for its behavior, we do not believe that a lesser sanction would serve the deterrent purposes of Rule 37.  *See National Hockey League,* 427 U.S. at 643, 96 S.Ct. at

---

to compel the giving of testimony or the production of books and papers by proper regulations prescribed by the legislative authority, and, for a failure to give or produce such evidence, the law might authorize a presumption in a proper case against the party refusing, justifying the rendering of a judgment by default, as if no answer had been filed.

*Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 352, 29 S.Ct. 370, 380-81, 53 L.Ed. 530 (1909).

[30]The Government additionally complains that it should not have been sanctioned because the plaintiffs were not prejudiced by its discovery abuses.  While perhaps relevant to the type of sanction imposed, a party need not always be prejudiced by its opponent's discovery abuses prior to the imposition of sanctions.  After all, the goal of sanctioning is not to reward the complying party, but to punish the infracting party and to deter others who may be want to engage in similar behavior.  *See National Hockey League,* 427 U.S. at 643, 96 S.Ct. at 2781.

2781 (concluding that if the Supreme Court reversed the district court's decision to dismiss the case under Rule 37, "it might well be that [petitioner] would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts").

For the above stated reasons we affirm the district court's decision to deem the liability facts as established for the purposes of this case.

### C. Propriety of Sanctioning Mr. Means

Although Mr. Means does not argue that the district court abused its discretion in sanctioning him, he does contend that by forbidding him from seeking reimbursement from the U.S. Government, the district court violated the separation of powers doctrine. Mr. Means asserts that as a member of the executive branch, and, more specifically, the Justice Department, the Attorney General—and not a member of the judiciary—is to discipline him.[31]

Congress has made it abundantly clear that it intends for Government attorneys to be treated the same as private attorneys. Amending 28 U.S.C. section 2412 in the Equal Access to Justice Act ("EAJA"), Congress determined that the Government should be held liable for attorney's fees and expenses "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b). The

---

[31]Mr. Means also refers the Court to regulations which allow the Justice Department to reimburse employees who have been sued in their individual capacities. Our review of those regulations, however, fails to reveal that they are inconsistent with the district court's decision here. The relevant section is entitled "Representation of Federal officials and employees by Department of Justice attorneys or by private counsel furnished by the Department in civil, criminal, and congressional proceedings in which Federal employees are sued, subpoenaed, or charged in their individual capacities." 28 C.F.R. § 50.15 (1992). Subsection (c)(1) provides that the "Department of Justice may indemnify the defendant Department of Justice employee for any verdict, judgment, or other monetary award which is rendered against such employee ..." *Id.* at § 50.15(c)(1).

This language is inapplicable in the situation before us: The regulation evinces no intent whatever to restrict a court's authority to impose sanctions against government employees. Even if an inconsistency existed, however, the Federal Regulations, which do *not* have the force of a federal statute, would have to bow to the Federal Rules of Civil Procedure, which do. *See Sibbach v. Wilson and Co.,* 312 U.S. 1, 13, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941).

House Committee on the Judiciary explained that the change in section 2412, which took effect in October 1981, simply "reflects the belief that, at a minimum, the United States should be held to the same standards in litigating as private parties." HOUSE COMM. ON THE JUDICIARY, EQUAL ACCESS TO JUSTICE ACT, H.REP. No. 96-1418. 96th Cong., 2d Sess. 9 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4953, 4984, 4987, 4996. Moreover, the EAJA specifically deleted subsection (f) of Rule 37,[32] which had precluded courts from imposing discovery sanctions on the United States.[33] Equal Access to Justice Act, Pub.L. No. 96-481, § 205; *see also* 1980 U.S.C.C.A.N. at 4998.

By taking away the Government's protection from Rule 37 sanctions, Congress could not have been clearer in revealing its intent to subject the Government and its attorneys to Rule 37(b)(2)(E) which provides that, except in circumstances not at issue in this case, district courts are to order the recalcitrant party, the attorney, *or both* to pay reasonable expenses, including attorney's fees, to the opposing party for violations of discovery orders.[34]

There is no question but that a court can forbid a private attorney from seeking reimbursement from clients or employers under Rule 37. *See Shipes,* 987 F.2d at 323 ("Under Rule 37(b), [the attorney] may be personally liable for reasonable expenses, including attorneys' fees, caused by his failure to comply with a discovery order."); *Derechin v. State University of New York,* 963 F.2d 513 (2d Cir.1992) (upholding a district court's decision to forbid a state-employed attorney from seeking reimbursement from the state). In fact, the Supreme Court, construing Rule 11, determined that the punishment and deterrent effects of sanctions are *maximized* when awarded against the attorney

---

[32]Subsection (f) provided: "EXPENSES AGAINST UNITED STATES. Except to the extent permitted by statutes, expenses and fees may not be awarded against the United States under this rule." *See* 4A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 37.01[11] (2d Ed.1992).

[33]Interestingly, the committee stated that it believed the EAJA would "make the United States proceed more cautiously" in judicial and administrative proceedings. 1980 U.S.C.C.A.N. at 4999.

[34]The rule reads:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. FED.R.CIV.P. 37(b)(2)(E).

personally:

> The purpose of the provision in question [which empowers courts to sanction persons or entities for the signing of frivolous documents], however, is not reimbursement, but "sanction;" and the purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility. It is at least arguable that *these* purposes are better served by a provision which makes clear that, just as the court expects the signer personally—and not some nameless person within his law firm—to validate the truth and legal reasonableness of the papers filed, so also it will visit upon him personally—and not his law firm—its retribution for failing in that responsibility. The message thereby conveyed to the attorney, [is] that this is not a "team effort" but in the last analysis [is] *yours alone*.... Moreover, ... there will be greater economic deterrence upon the signing attorney, who will know for certain that the district court will impose its sanction entirely upon him, and not divert part of it to a partnership ..."

*Pavelic and LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989) (emphasis in original).

We believe the reasoning in *Pavelic and LeFlore* holds true for Rule 37 sanctions. The district court's decision to prevent Mr. Means from seeking reimbursement was not inconsistent with the goals of Rule 37.[35]

That Congress has allowed federal courts to sanction Government attorneys in the same manner that those courts sanction private attorneys does not answer Mr. Means' contention that such a rule is violative of the separation of powers doctrine. It goes without saying that any rule which violates the Constitution, even if authorized by federal statutes, must be struck down. However, we believe that such is not the case here.

---

[35]*Blue v. United States Department of the Army* is inapposite to the facts of this case. There, the district court forbade the NAACP from reimbursing one of the attorneys who had been sanctioned, reasoning that NAACP members should not have to pay for the transgressions of the attorney. 914 F.2d 525, 549 (4th Cir.1990), *cert. denied,* --- U.S. ----, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991). Unlike this case, the NAACP was not involved *in any way* with the litigation in *Blue.* It was not a party, and it did not supply the attorney. The Fourth Circuit reversed, concluding that the district court had no authority to tell the NAACP, an entity which was not involved in the case, how *not* to expend its monies.

> While it is certainly true that the district court in the case *sub judice* commented that taxpayers should not be penalized for the misconduct of Mr. Means, the record in this case shows all too clearly that, unlike the district court in *Blue,* this district court's primary reason in precluding Mr. Means—who *was* at all times involved in this litigation—from seeking reimbursement was to punish Mr. Means for his flagrant disregard of his discovery obligations. Such a reason for imposing sanctions is entirely appropriate. *National Hockey League,* 427 U.S. at 643, 96 S.Ct. at 2781; *See Derechin v. State University of New York,* 963 F.2d 513 (2d Cir.1992) (upholding district court's decision to prohibit state attorney from seeking reimbursement).

Contrary to Mr. Means' contention that the district court's decision violated the separation of powers doctrine, we believe that to *restrict* a district court's power to fashion appropriate sanctions, simply because the transgressor is a member of the executive or legislative branch,[36] would violate the separation of powers doctrine.[37]  Such a decision would invite members of our sister branches to ignore acceptable standards of decorum in courts and flout court orders.  Indeed, to rule as Mr. Means requests would rob federal courts of power they inherited at their inception:  power to preserve order in judicial proceedings and enforce judgments.[38]  This Court recently ruled that it would not hesitate to strike down any law which weakens the judiciary's power to enforce its orders as unconstitutionally violative of the separation of powers doctrine.  *In re Stone,* 986 F.2d 898, 902 (5th Cir.1993).  We refuse to now approve of that which we have so recently condemned—the erosion of a district court's authority to properly compel compliance with its orders.  *See McBride*

---

[36]Governmental attorneys should model the ideals of integrity and ethics rather than attempt to circumvent them.  *See Perry v. Golub,* 74 F.R.D. 360, 366 (N.D.Ala.1976) (asserting that public interest dictates that the Government, more than any other entity, comply with court orders).

[37]The Government contends that prohibiting Government attorneys from seeking and receiving reimbursement may inhibit such attorneys from vigorously representing the Government and espousing unpopular, yet necessary, legal positions.  This "chilling" argument has no more force when invoked by the Justice Department than when invoked by opponents of Rule 11 of the Federal Rules of Civil Procedure.  As long as district courts use their sanction authority carefully, no such effects will occur.  In any event, appellate review will, in appropriate cases, deter excessive or unwarranted sanctions by the district courts.

[38]So important and deeply rooted is the federal courts' authority to enforce their orders and punish willful infractions thereupon that the seventeenth section of the Judiciary Act of 1789 provided that all federal courts "shall have power ... to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same." *As quoted in Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 22 L.Ed. 205 (1873).  Writing for the Court in *Ex parte Robinson,* Justice Field began his opinion as follows:

> The power to punish for contempts is inherent in all courts;  its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. *The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.*

*Id.* (emphasis added);  *see also United States v. Hudson and Goodwin,* 11 U.S. (7 Cranch) 32, 33, 3 L.Ed. 259 (1812) (asserting that "[t]o fine for contempt—imprison for contumacy—inforce the observance of order, &c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others ...").

*v. Coleman,* 955 F.2d 571, 582-83 (8th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992) (Lay, C.J., dissenting) (concluding that "[i]t would seriously erode our system of separation of powers if the executive branch was (sic) effectively immune from the judicial power. The federal courts must have the inherent authority to enforce executive branch compliance with judicial orders.... Otherwise, the judiciary would be powerless to impose the most effective remedy for ensuring compliance with its orders against the most frequent litigant in the federal courts").

### III. Conclusion

The decision of the district court is AFFIRMED, and we tax all costs and attorney's fees for this appeal against the Government.

EDITH H. JONES, Circuit Judge, concurring specially:

I concur with all of Judge Johnson's fine opinion except for the following bit of dicta:

> To *restrict* a district court's power to fashion appropriate sanctions, simply because the transgressor is a member of the executive or legislative branch, would violate the separation of powers doctrine. (footnotes omitted). (emphasis added)

This is as unfortunate an overstatement as the government's contrary proposition that Judge McBryde's order preventing Means from seeking reimbursement from the Justice Department somehow *violates* the separation of executive and judicial powers. This court recently described the scope of a court's sanction against the backdrop of the constitutional separation of powers and concluded that sanctions fall within the court's inherent powers "necessary to the exercise of all others." *In re Stone,* 986 F.2d 898, 902 (5th Cir.1993), citing *Roadway Express v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980).[1] *Stone* then says:

> Congress may interfere with this category of inherent power within "limits not previously defined," so long as it does not abrogate or render the specific power inoperative. *Id.,* citing *Michaelson v. U.S.,* 266 U.S. 42, 65-66, 45 S.Ct. 18, 19-20, 69 L.Ed. 162 (1924).

On the same page, *Stone* says that

> If the power belongs in the ... category [of sanctions], we must ascertain whether a valid statute or rule attempts to regulate the court's use of the power. If such a law exists, we then

---

[1]I do not know whether *Stone* 's analysis of inherent powers, borrowed from an Eighth Circuit case, is fully valid. The Supreme Court declined to approve the Eighth Circuit analysis in *Chambers v. NASCO, Inc.,* --- U.S. ---- n. 12, 111 S.Ct. 2123 n. 12, 115 L.Ed.2d 27 (1991), but I do not rely upon that aspect of *Stone.*

must determine whether the law abrogates or renders the power practically inoperative. *Id.,* citing *Michaelson,* 266 U.S. at 66, 45 S.Ct. at 20.

*Stone* disposes of this case. That the government says there is a violation of the separation of powers doctrine does not *ipso facto* make it so. The government's concern is too speculative upon the facts before us. First, contrary to the Justice Department's argument, it is not at all clear that its regulation bears on, much less purports to limit the court's independent power to determine how it will sanction a government employee. Second, the Justice Department offered no evidence or argument that Means *would* qualify for reimbursement *but for* the district court's order. Further, the government does not assert that the district court's order actually impinged upon the policy and personnel interests that it asserts are protected by immunity from such an order. These facts counsel against our rushing to opine upon an important constitutional issue. If the regulation affected the court's sanction power to the limited extent of preventing the court from issuing a sanction against an assistant United States attorney individually and non-reimbursably, it appears to me that such a regulation would not render this court's inherent sanction power "inoperative". A court has numerous other types of sanction remedies available against the federal government and its attorneys even if this one is not. To decide this point precisely is, however, unnecessary. The government's argument fails on the facts before us.

\* \* \* \* \* \*